U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

# UNITED STATES DISTRICT COURT

## DISTRICT OF VERMONT

2016 MAY 17 AM 4: 35

CLERK

BY _PC_
DEPUTY CLERK

---

JAMES B. SHAW, JOHANNES EIJMBERTS, and
LORNE MORRIS Individually and On Behalf of All
Others Similarly Situated,

Plaintiffs,

v.

RAYMOND JAMES FINANCIAL, INC.,
RAYMOND JAMES AND ASSOCIATES,
PEOPLE'S UNITED FINANCIAL, INC.,
PEOPLE'S UNITED BANK, ARIEL QUIROS,
WILLIAM STENGER, JOEL BURSTEIN AND
FRANK AMIGO

Defendants.

CIVIL ACTION NO.: _5 : 16-CV-129_

**COMPLAINT – CLASS ACTION**

**JURY TRIAL DEMANDED**

---

Plaintiffs James B. Shaw, Johannes Eijmberts and Lorne Morris ("Plaintiffs"), individually

and on behalf of all others similarly situated, allege the following against Raymond James

Financial, Inc., Raymond James & Associates, People's United Financial, Inc., People's United

Bank, Ariel Quiros, William Stenger, Joel Burstein and Frank Amigo based on personal

knowledge, information and belief, and the investigation of counsel.  This Court has jurisdiction

over this action pursuant to the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d) and

based on federal question jurisdiction, pursuant to 28 U.S.C. § 1331.

//

//

//

## NATURE OF THE ACTION

1.     The Northeast Kingdom in Vermont is comprised of the state's three northern-most counties: Essex, Orleans and Caledonia.  Known for its scenic beauty, the Northeast Kingdom attracts tourists from throughout the world who are enamored with its rustic charm and world-class skiing at Jay Peak Resort ("Jay Peak"), located on Jay Peak in the Green Mountains of Vermont.

2.     In 2008, Ariel Quiros ("Quiros") and William Stenger ("Stenger"), the owner/operators of Jay Peak, announced a plan to spur economic development in the Northeast Kingdom by investing $500 million in the area with funds acquired through the EB-5 immigrant investor program (the "EB-5 Program").

3.     The EB-5 Program provides a method of obtaining a permanent residence status (a "green card") for foreign nationals who invest money to promote economic development in the United States. The program, which is administered nationally by the U.S. Citizenship and Immigration Services, provides green cards to individuals who invest at least $500,000 in a high-unemployment or rural area like the Northeast Kingdom that then creates or preserves at least ten jobs for U.S. workers.  Moreover, if the project is successful, investors will be entitled to returns on their investment as set forth in the offering documents for the particular project.

4.     In a typical EB-5 project, investor funds are raised and used to complete a specific project described in the project's private placement memorandum or offering documents.  Once the individual has invested, he or she may apply for a conditional green card, which is valid for two years.  If the investment creates or preserves at least ten jobs during those two years, the investor may apply to have the conditions removed from his or her green card, and the investor may then live and work in the U.S. permanently.

5.     Quiros and/or Stenger were involved in funding, exclusively through the EB-5 Program, six additions to Jay Peak consisting of hotels, penthouse suites, lodges, townhomes, certain resort amenities and an 18-hole championship golf course. Brazenly, they also announced that they would cap off their efforts by building a massive biomedical research facility – despite the fact that neither Quiros nor Stenger had experience in the field of biomedical research. Each of these seven projects (collectively referred to herein as the "EB-5 Projects") would be funded through limited partnerships comprised solely of EB-5 immigrants, which partnerships were funded solely by EB-5 investors. Quiros and Stenger projected that the EB-5 Projects would create 5,000 construction jobs plus 5,000 more permanent jobs in ten years.

6.     Quiros's and Stenger's plans made them heroes in the Northeast Kingdom, as the two claimed that the EB-5 Projects would help transform the area's lagging economy into the state's job-creation leader. In the early years of their efforts, Quiros and Stenger appeared to be making good on the adage that it is possible to "do well by doing good."

7.     In reality, Quiros and Stenger misused, commingled, and stole investor money, hiding their activities with the active assistance and knowledge of Raymond James Financial, Inc., Raymond James & Associates, Joel Burstein (Quiros's son-in-law and manager of his Raymond James investment accounts) and Frank Amigo (Burstein's supervisor at the south Florida Raymond James complex) (collectively, the "Raymond James Defendants"). The Raymond James Defendants helped structure and execute this deceptive scheme on behalf of Quiros in exchange for lucrative fees and commissions. As Quiros testified before the SEC, the Raymond James Defendants were "the one who designed this whole program." In doing so, the Raymond James Defendants directly participated in and furthered the scheme.

8.     This scheme was further aided by People's United Bank (formerly Chittenden

3

Trust Company), a subsidiary of People's United Financial, Inc.  In July 2010, People's United Financial, Inc. acquired Chittenden Trust Company/Chittenden Bank of Burlington, Vermont ("Chittenden") and became its successor in interest.  People's United Financial, Inc., People's United Bank, and Chittenden Trust Company/Chittenden Bank of Burlington, Vermont are collectively referred to as "People's Bank."  People's Bank mishandled the EB-5 investors' funds deposited in escrow accounts that were intended to fund specific EB-5 Projects.  People's Bank, as escrow agent for each of the EB-5 Projects, ignored blatant warning signs and allowed transfers of investor funds to Raymond James accounts not controlled by the general partners of the specific EB-5 Projects – in contravention of the escrow agreements designed to protect the EB-5 investors and its role as fiduciary to the EB-5 investors.

9.    Through this scheme, Quiros and Stenger misused over $200 million in EB-5 investor funds.

10.    Quiros and Stenger were operating an elaborate Ponzi-like scheme.  Investors in the EB-5 Projects were told they were investing in project-specific hotels, cottages, a biomedical research facility or other projects.  While some of the funds were used for those projects, the majority of the funds were commingled, misused, and diverted to pay for unauthorized projects, payments to earlier investors and personal luxuries.

11.    The fraudulent scheme came crashing down in April 2016, when the U.S. Securities and Exchange Commission ("SEC") and the Commissioner of the Vermont Department of Financial Regulations ("VDFR") filed enforcement actions against Quiros, Stenger, and their affiliated companies.[1]  Documents released to the public in connection with

---

[1] On April 12, 2016, the SEC filed a complaint in the U.S. District Court for the Southern District of Florida. *SEC v. Quiros, Stenger, Jay Peak, Inc., et al.*, No. 16-21301-CV-DPG (S.D. Fla.) (the "SEC Action").  The same day, the SEC filed, and the Court granted, an Emergency Motion for Temporary Restraining Order, Asset Freeze, and Other

the SEC Action and VDFR Action exposed, in detail, the massive fraud orchestrated by Quiros and Stenger and carried out with the knowledge and assistance of the Raymond James Defendants and People's Bank.

12.     As detailed in the SEC complaint and the documents filed therewith, the scheme allowed Quiros to misappropriate more than $50 million in investor money that he used for, among other things: (i) financing his purchase of Jay Peak; (ii) backing a personal line of credit to pay his income taxes; (iii) purchasing a luxury condominium in New York City; (iv) paying taxes of an unrelated company he owns; (v) buying an unrelated resort; and (vi) paying off margin loans owed to Raymond James.

13.     This class action, on behalf of a nationwide class of investors in the Jay Peak Limited Partnerships (defined below) (collectively, the "Class"), seeks injunctive relief and damages.

## PARTIES

### A.     *Plaintiffs*

14.     Plaintiff James B. Shaw ("Shaw") is an English citizen who invested over $500,000 in one of the EB-5 Projects (Jay Peak Hotel Suites Phase II L.P., discussed *infra*), and has been damaged by Defendants' conduct alleged herein.  Mr. Shaw currently resides in Beverly, Massachusetts.

15.     Johannes Eijmberts is a citizen of the Netherlands who invested over $500,000 in one of the EB-5 Projects (Jay Peak Hotel Suites Stateside L.P., discussed *infra*), and has been damaged by Defendants' conduct alleged herein.  Mr. Eijmberts currently resides in Boston, Massachusetts.

---

Relief.  On April 14, 2016, the VDFR filed its action in the Vermont Superior Court Washington Unit.  *State of Vermont v. Ariel Quiros, et al.,* No. 217-4-17-WNCV (the "VDFR Action").

16.     Lorne Morris is a Citizen of Canada who invested over $500,000 in one of the EB-5 Projects (Jay Peak Hotel Suites Stateside L.P., discussed *infra*), and has been damaged by Defendants' conduct alleged herein.  Mr. Morris currently resides in Brooklyn, New York.

### B.     *Jay Peak Defendants*

17.     Defendant Quiros resides in Key Biscayne, Florida.  Quiros is the Chairman of Jay Peak and is the sole owner, officer and director of the holding company that controls Jay Peak, Q Resorts.  Quiros effectively controlled each of the seven EB-5 Projects at issue in this litigation.

18.     Defendant Stenger is a citizen of Vermont and resides in Newport, Vermont.  He is the Director, President, and CEO of Jay Peak.  Stenger is a general partner and/or director of each of the seven EB-5 Projects at issue in this litigation.

### C.     *Raymond James Defendants*

19.     Defendant Raymond James Financial, Inc., d/b/a Raymond James, is a corporation organized and existing under the laws of the state of Florida.  Raymond James is a diversified financial services holding company with subsidiaries engaged primarily in investment and financial planning, investment banking, and asset management.  Raymond James stock is publicly traded on the New York Stock Exchange under the ticker symbol "RJF."

20.     Defendant Raymond James & Associates, Inc. is a corporation organized and existing under the laws of the state of Florida and a broker-dealer subsidiary of Raymond James Financial, Inc.  Raymond James & Associates, Inc. provides investment management services for retail and institutional clients and trust services.

21.     Raymond James Financial, Inc. and Raymond James & Associates, Inc. (collectively "Raymond James") systemically conduct business in the State of Vermont through

offices and representatives providing varying financial services to Vermont residents and avail themselves of the benefits and protections of Vermont through Raymond James's registration as a broker-dealer in Vermont. Raymond James held funds in connection with each of the EB-5 Projects.

22.    Defendant Joel Burstein ("Burstein") is a citizen of the State of Florida. He is Quiros's former son-in law and the Miami Branch Manager and Vice President of Investments for the Raymond James South Florida Complex. He manages three Raymond James locations: Miami, Miami Beach and Dadeland. Burstein also maintains an active registration as a Broker-Dealer Representative in Vermont. Burstein was the Raymond James employee responsible for the accounts used in connection with the fraudulent scheme described herein.

23.    Defendant Frank Amigo ("Amigo") is a citizen of the State of Florida. He is currently Managing Director for Raymond James's South Florida Complex and was Burstein's supervisor during the relevant period. Amigo advised Quiros on how to structure his accounts and EB-5 accounts at Raymond James. Amigo maintains an active registration as a Broker-Dealer Representative in Vermont.

### D.    *People's Bank*

24.    Defendant People's United Financial, Inc., a diversified financial services company with over $39 billion in assets, is the parent company of People's United Bank.

25.    Defendant People's United Bank, a subsidiary of People's United Financial, Inc., is a federally chartered savings bank headquartered in Bridgeport, Connecticut. People's United Bank's Burlington, Vermont branch acted as escrow agent for investor funds for each of the EB-5 Projects. People's United Bank maintains its Vermont District Office in Burlington, Vermont.

26.    Each investor in the EB-5 Projects deposited his or her full investments into escrow accounts at People's Bank.

**RELEVANT NON-PARTIES**

27.    Jay Peak, Inc. is a Vermont corporation with its principal place of business in Jay, Vermont.  It operates the Jay Peak Resort in Jay, Vermont, a 4-season resort located in the Northeast Kingdom.  The first 6 EB-5 Projects discussed herein were ostensibly designed to fund expansions or improvements at Jay Peak.  The assets of Jay Peak, Inc. and Jay Peak have been frozen by the U.S. District Court for the Southern District of Florida in connection with the SEC Action and are being held in Receivership.

28.    Q Resorts, Inc. ("Q Resorts") is a Delaware corporation with its offices in Miami, Florida.  Quiros is the sole owner, officer, and director of Q Resorts, which owns 100% of Jay Peak Inc. and Jay Peak.   Q Resorts acquired Jay Peak from Mont Saint-Sauveur International, Inc. ("MSSI") in 2008, and Quiros has since overseen the various EB-5 Projects through Q Resorts.  The assets of Q Resorts have also been frozen and are being held in Receivership in connection with the SEC Action.

29.    MSSI is a Quebec company that owns and operates several ski resorts in North America.  MSSI owned and operated Jay Peak Resort from approximately 1978 until 2008.

30.    In the early 2000s, MSSI began transforming Jay Peak from a ski area to a four-season resort.  At the urging of Stenger, who was then-President and Chief Executive Officer of Jay Peak, MSSI began to raise financing for this transformation through the EB-5 Program.

31.    In or about 2006, MSSI undertook to fund two expansions of the hotel accommodations at Jay Peak though the EB-5 Program – raising $17.5 million from 35 foreign investors in Phase I and $75 million from 150 foreign investors in Phase II.

## THE EB-5 PROJECTS

32.     *Jay Peak Hotel Suites L.P.* ("Phase I") is a Vermont limited partnership with its principal place of business in Jay, Vermont.  Between December 2006 and May 2008, Phase I raised $17.5 million from 35 investors through an EB-5 offering of limited partnership interests. As set forth in the Offering Documents,[2] these investments were intended to build an all-suite hotel with 57 units.

33.     The general partner of Phase I is Jay Peak Management, Inc. ("JPM"), a Vermont Corporation.  JPM is a wholly-owned subsidiary of Jay Peak, and Stenger is its President.

34.     *Jay Peak Hotel Suites Phase II L.P.* ("Phase II") is a Vermont limited partnership with its principal place of business in Jay, Vermont.  Between March 2008 and January 2011, Phase II raised $75 million from 150 investors through an EB-5 offering of limited partnership interests.  As set forth in the Offering Documents, these investments were intended to build a 120-unit all-suite hotel, an indoor water park, an ice rink, a bowling alley and a golf clubhouse.

35.     The general partner of Phase II is JPM.

36.     *Jay Peak Penthouse Suites L.P.* ("Phase III") is a Vermont limited partnership with its principal place of business in Jay, Vermont.  Between July 2010 and October 2012, Phase III raised $32.5 million from 65 investors through an EB-5 offering of limited partnership interests.  As set forth in the Offering Documents, these investments were intended to build 55 penthouse suites within the Phase II hotel and an activities center.

---

[2] Investors in each of the EB-5 Projects received offering materials consisting of a private placement memorandum ("PPM"), a business plan, a limited partnership agreement ("LP Agreement"), and executed an escrow agreement between the investor and People's Bank ("Escrow Agreement"). These documents are collectively referred to herein as the "Offering Documents."

37.    The general partner of Phase III is Jay Peak GP Services, Inc., a Vermont corporation.  Stenger is the director and only principal of Jay Peak GP Services, Inc.

38.    ***Jay Peak Golf and Mountain Suites L.P.*** ("Phase IV") is a Vermont limited partnership with its principal place of business in Jay, Vermont.  Between December 2010 and November 2011, Phase IV raised $45 million from 90 investors through an EB-5 offering of limited partnership interests. As set forth in the Offering Documents, these investments were intended to build 50 golf and mountain cottages adjacent to Jay Peak's championship golf course, a wedding chapel, and other facilities.

39.    The general partner of Phase IV is Jay Peak GP Services Golf, Inc., a Vermont corporation.  Stenger is the director and only principal of Jay Peak GP Services Golf, Inc.

40.    ***Jay Peak Lodge and Townhouses L.P.*** ("Phase V") is a Vermont limited partnership with its principal place of business in Jay, Vermont.  Between May 2011 and November 2012, Phase V raised $45 million from 90 investors through an EB-5 offering of limited partnership interests.  As set forth in the Offering Documents, these investments were intended to build 30 vacation rental townhouses, 90 vacation rental cottages, a café, and a parking garage.

41.    The general partner of Phase V is Jay Peak GP Services Lodge, Inc., a Vermont corporation.  Stenger is the director and only principal of Jay Peak GP Services Lodge, Inc.

42.    ***Jay Peak Hotel Suites Stateside L.P.*** ("Phase VI") is a Vermont limited partnership with its principal place of business in Jay, Vermont.  Between October 2011 and December 2012, Phase VI raised $67 million from 134 investors through an EB-5 offering of limited partnership interests.  As set forth in the Offering Documents, the Phase VI investments were intended to build: (i) an 84-unit hotel at the base of Jay Peak's popular "Stateside" ski area;

(ii) 84 vacation rental cottages; (iii) a guest recreation center emphasizing family-friendly entertainment; and (iv) a medical center designed to serve both resort guests and the local community, which lacks access to walk-in and minor emergency healthcare.

43.    The general partner of Phase VI is Jay Peak GP Services Stateside, Inc., a Vermont corporation.  Stenger is the director and only principal of Jay Peak GP Services Stateside, Inc. Although Phase VI has been fully subscribed since December 2012, only the hotel has been built. Phase VI lacks the funds to complete the remainder of the project, which is estimated to require an additional $26 million.

44.    ***Jay Peak Biomedical Research Park L.P.*** ("Biomedical Project") is a Vermont limited partnership with its principal place of business in Newport, Vermont.  Since November 2012, the Biomedical Project has raised approximately $83 million from 166 investors through an EB-5 offering of limited partnership interests.   As set forth in the Offering Documents, the intended purpose of these investments was to construct a biomedical research facility in Newport, Vermont that would research and develop artificial organs, cell therapy medicine, and medical devices.

45.    The general partner of Biomedical Project is AnC Bio Vermont GP Services, LLC, a Vermont Limited Liability Company.  Quiros and Stenger are the managing members of AnC Bio Vermont GP Services, LLC.  Other than some initial site preparation and groundbreaking, no work has been done on the facility, including the procuring of necessary U.S. Food and Drug Administration ("FDA") approvals for a facility of this type.

46.    The EB-5 Projects general partners, Jay Peak Management, Inc., Jay Peak GP Services, Inc., Jay Peak GP Services Golf, Inc., Jay Peak GP Services Lodge, Inc., Jay Peak GP Services Stateside, Inc., and AnC Bio Vermont GP Services, LLC are collectively referred to

herein as the "General Partners."

## JURISDICTION AND VENUE

47.     This Court has jurisdiction over this action under the CAFA, 28 U.S.C. § 1332(a).

At least one Class member is of diverse citizenship from one Defendant.  The proposed Class

consists of more than 100 members, and the amount in controversy for the Class exceeds $5

million, exclusive of interest and costs. Further, in determining whether the $5 million amount

in controversy requirement of 28 U.S.C. § 1332(d)(2) is met, the claims of the putative class

members are aggregated. 28 U.S.C. § 1332(d)(6).

48.     The Court also has original jurisdiction over this action, pursuant to 28 U.S.C. §

1331, as this action asserts claims under the Racketeer Influenced and Corrupt Organizations

Act, 18 U.S.C. §§ 1962(b)-(d).   Accordingly, under 28 U.S.C. § 1367(a), this Court has

supplemental jurisdiction over all other claims in this action.

49.     The Court has personal jurisdiction over Defendants pursuant to 18 U.S.C. §§

1965(b) and (d), as well as under the Vermont long arm statute, 12 V.S.A. § 913(b).  Specifically,

a substantial portion of Defendants' acts giving rise to the claims alleged herein were performed

in this district or directed at this district.  In addition, each of the Defendants availed themselves

of the rights and protections of Vermont, reside or maintain offices here, maintain registrations

with state regulators in Vermont, and/or have ongoing, substantial, and intentional business

contacts with Vermont.

50.     Venue is proper in this district under 28 U.S.C. § 1391 because Defendants are

deemed to reside in any judicial district in which they are subject to personal jurisdiction.

## SUBSTANTIVE ALLEGATIONS

### A. The Initial EB-5 Projects at Jay Peak – Phases I and II

51.     Among the most popular tourist destinations in the Northeast Kingdom is Jay Peak.  Founded in 1957, Jay Peak was originally a simple ski resort located on Jay Peak in the Green Mountains of Vermont.  Its vertical drop of 2,153 feet is the eighth largest in New England and the fifth largest in Vermont.  The following as an aerial view of Jay Peak as currently constituted:



52.     From 1978 until 2008, Jay Peak was owned by MSSI.  MSSI is a Quebec company that owns and operates several ski resorts in North America, most notably on the world-renowned slopes of the Laurentine Mountains in Quebec.

53.     In or about the fall of 2007, Quiros and Stenger began working toward Quiros's potential acquisition of Jay Peak, and the two entered into discussions with MSSI.

In January 2008, MSSI gave functional control of Jay Peak to Quiros based upon the understanding that legal control would pass to Quiros upon closing of the acquisition.

54.    In preparing to close on the deal to purchase Jay Peak, Quiros approached Raymond James, through Burstein, to open and manage the accounts Quiros would use in connection with the acquisition of Jay Peak and to discuss financing for the acquisition.

55.    According to Quiros's sworn testimony before the SEC, Raymond James created the fraudulent structure of the Jay Peak financing scheme that continued through each of the seven EB-5 Projects.  Quiros testified that "Raymond James [were] the ones who developed my banking structure in 2008... [Raymond James] put this structure together for me."

56.    Burstein also provided sworn testimony to the SEC relating to how he and Quiros discussed financing the purchase of Jay Peak using margin loans.  According to Burstein, Frank Amigo from Raymond James (Burstein's supervisor and current Managing Director for Raymond James's South Florida Complex) participated in that conversation.

57.    Quiros, Burstein, and Amigo discussed how the margin loans would work – the EB-5 investor funds received and being held in escrow in Vermont (at People's Bank's predecessor bank)[3] would be transferred into a margin account at Raymond James nominally related to the project development.[4]  Quiros, Burstein and Amigo also discussed how

---

[3] As discussed supra, People's Bank's predecessor in interest, Chittenden, handled the escrow funds for investors until Chittenden was acquired by People's United Financial, Inc. (the parent of People's United Bank) in July 2010.

[4] A margin account is an account offered by brokerage firms that allows customers of the brokerage firm to borrow cash against the value of the brokerage account.  The brokerage firm charges the investor interest for the right to borrow money and uses the brokerage account and any securities purchased with the cash as collateral for the loan to the customer.

Quiros would then transfer a portion of those funds into another Raymond James account to pay MSSI for the acquisition of Jay Peak using investors' – not Quiros's own – funds. Quiros, Burstein and Amigo concealed from MSSI that investor funds were being used to acquire Jay Peak, in violation of the Limited Partnership Agreements. Quiros then used the investor funds remaining in the margin accounts as collateral to borrow additional funds to purchase United States Treasury Bills ("T-bills") in the full amount initially transferred to Raymond James from the Chittenden/People's Bank escrow account on behalf of the investors. Thus, it would appear to investors that their entire investment was held in secure T-bills. In reality, however, a large portion of investor funds were used to purchase Jay Peak and the remainder of investor funds had been pledged as collateral for Quiros's personal loan from Raymond James in violation of the Offering Documents and were at risk of loss.

58.     In order to execute the scheme planned by Quiros, Stenger, and the Raymond James Defendants, Quiros incorporated Q Resorts in February 2008 as the entity that would officially purchase Jay Peak. On June 13, 2008, Quiros opened an account on behalf of Q Resorts with Raymond James. Then, on June 17, 2008, Quiros opened two margin accounts at Raymond James under the names of the Phase I and Phase II projects, over which he had total control.

59.     With the architecture of the scheme in place, Quiros was ready for the closing of the Jay Peak acquisition. Between June 16 and 20, 2008, MSSI transferred $11 million from a Phase I escrow account and $7 million from a Phase II escrow account (both held in Vermont by Chittenden, predecessor of People's Bank) to their respective MSSI-controlled namesake accounts at Raymond James. Shortly after closing the Jay Peak acquisition, Stenger transferred

those funds to the Phase I and II margin accounts at Raymond James that were wholly controlled by Quiros.

60.     The transfers of funds to accounts not controlled by the limited partnerships were not permitted by the terms of the Offering Documents and breached the terms of the Escrow Agreements between Peoples Bank (through its predecessor) and the Phase I and II limited partnerships and investors.

61.     Later on June 23, 2008, Quiros and the Raymond James Defendants transferred to the Q Resorts Raymond James account a total of $7.6 million of the Phase I investor funds from the Phase I margin account and $6 million from the Phase II margin account. Then, completing the round-trip transaction, Quiros, Stenger and the Raymond James Defendants fraudulently transferred $13.5 million from the Q Resorts account to MSSI (through MSSI's attorneys) as partial payment for the purchase of Jay Peak.

62.     The following diagram provides a simple depiction of the circular flow of Phase I and II investor funds at the closing of the Jay Peak acquisition:



63.     With the transfers of investor funds complete, Quiros then borrowed funds from Raymond James to replenish the Phase I and II accounts.  Thus, it would appear to the investors, after the sale of Jay Peak that their total investment funds remained securely invested in T-bills.  However, because these T-Bills were actually bought on margin and used as collateral for Quiros's debt to Raymond James, investors did not in fact have a claim to these funds.  Rather, they were at risk of being forfeited to Raymond James if Raymond James made a margin call.

64.     These margin loans violated the terms of each Jay Peak Limited Partnership Agreement, which specifically prohibited the projects' general partners from encumbering or pledging investor funds as collateral without the express approval of the investors.  Neither Stenger nor Quiros ever told any investors in the EB-5 Projects that they were using investor money in this fashion.

65.     Quiros orchestrated further improper transfers from investor accounts to

pay his own personal expenses and complete the purchase of Jay Peak. In fact, Quiros transferred an additional $5.5 million of investor funds (laundered through the Q Resorts account) to the law firm representing MSSI. Quiros also used investor funds to pay his own attorneys who advised him on the transaction, further violating the terms of the Offering Documents.

66.    Quiros and Stenger executed each of the transactions described above with full knowledge or reckless disregard that they were using Phase I and Phase II investor funds in violation of the Offering Documents, which strictly limited how investor funds could be used, prohibited commingling of funds, and prohibited the use of investor funds for unauthorized purposes.

67.    Quiros admitted under oath in his SEC deposition that he commingled funds between projects and used what he called a "one-window" approach to consolidate all investor funds in one place. Additionally, Stenger testified that he knew that investor funds were used to purchase T-bills.

68.    The Raymond James Defendants devised and knowingly assisted the Phase I and Phase II transactions described above by creating the architecture of the intra-account transfers that enabled Quiros to purchase Jay Peak and executed the improper transfers between Raymond James accounts. Removing any doubt that the Raymond James Defendants were complicit in this fraud, on or about June 18, 2008, MSSI representatives wrote a letter to Raymond James (this was prior to the closing of the Jay Peak transaction), with copies to Quiros and Stenger, among others, stating that:

- The funds in the MSSI Raymond James Suites Phase I account were investor funds. "These funds were invested by immigrant investors in this limited partnership and must be held and/or used strictly in accordance with the limited partnership agreement, a copy of which I

18

understand has already been provided to you. **You confirmed that these funds will not be used in any manner, including as collateral or a guarantee, to finance [Q Resorts, Inc.'s purchase of] the Jay Peak Resort.**" (Emphasis added).

- Any money transferred to the Raymond James Hotel Phase II account similarly consisted of investor funds. "**Once again these funds may not be used in any manner, including as collateral or a guarantee, to fund the purchase of the Jay Peak Resort.**" (Emphasis added).

69.     In short, Quiros, Stenger and the Raymond James Defendants knew that the funds in the Jay Peak Limited Partnership accounts were EB-5 investor funds that could not legally be used by Quiros in any way to purchase Jay Peak.  In blatant disregard of this fact, Quiros, Stenger and the Raymond James Defendants orchestrated a series of transfers and loans in an attempt to hide their misdeeds.

### B. The Fraud Continues – Phases III-VI and the Biomedical Project

70.     The apparent "success" of Quiros, Stenger and the Raymond James Defendants in orchestrating the fraudulent acquisition of Jay Peak put Quiros and the Jay Peak EB-5 Projects on a path to ruin.  In classic Ponzi scheme fashion, a pattern emerged whereby investor funds from each new EB-5 Project were used to pay off prior investors and Quiros's margin loans, and finance unrelated projects as well as Quiros's lavish lifestyle.

71.     Jay Peak, Quiros and Stenger marketed the EB-5 limited partnerships and solicited investors in many ways, including through websites, intermediaries who promoted the investments, immigration attorneys with interested clients, and meetings abroad with prospective investors.   Jay Peak, Quiros and Stenger also sponsored booths and spoke at immigration-related conferences and events, both in the United States and abroad.  Stenger met in person with a significant number of the investors in the EB-5 Projects, and in recent years, Quiros has attended meetings with investors and answered their questions.

72.     In addition, Stenger told investors that he anticipated the EB-5 Projects would

each make a 2%-6% annual return once they were complete and operating.

73.     Through these efforts, Quiros and Stenger initiated five additional EB-5 projects.

74.     After purchasing Jay Peak with the first two margin loans from Raymond James, Quiros continued to use the Phase I and Phase II margin accounts and therefore maintained large margin loan balances that needed to be paid down.

75.     In February 2009, Quiros consolidated the first two margin loans into one margin loan ("Margin Loan III"), which was still backed by Phase I and Phase II investor funds.  Quiros then signed credit agreements pledging investor funds from Phases III-VI as collateral.  Quiros then used more than one hundred million dollars of EB-5 investors' money to pay down Margin Loan III, which was finally paid off on February 24, 2012.

76.     Four days later, on February 28, 2012, Quiros opened another margin loan account ("Margin Loan IV"), which was backed by investor funds from EB-5 Projects Phases V and VI.

77.     Each of these EB-5 Projects was pilfered by Quiros and Stenger, with investor funds being used for unpermitted purposes, e.g., funding unrelated projects and expenses, as well as providing Quiros with a lavish lifestyle.

### (a)     *Phase III Penthouse Suites*

78.     In Phase III, Quiros and Stenger raised $32.5 million from 65 EB-5 investors for the construction of 55 penthouse suites within an existing hotel at Jay Peak.  Under the terms of the Offering Documents, these funds were to be used solely for construction, construction supervision, construction supervision expenses, parking and purchase of land contractor fees, engineering and utilities working capital.

79.     In violation of the Phase III Offering Documents, Quiros and Stenger transferred about $20 million in Phase III investor funds to a Quiros-controlled Raymond James account,

which he pledged as collateral for a margin loan.  Quiros also transferred $4.5 million to a Q Resorts account at Raymond James, where he comingled those funds with funds from other EB-5 Projects.  Quiros ultimately used $32.5 million from Phase III to pay off Margin Loan III.

### (b)     Phase IV Golf and Mountain

80.     In Phase IV, Quiros and Stenger raised $45 million from 90 EB-5 investors for the construction of 50 golf and mountain cottages.  Under the terms of the Offering Documents, these funds were to be used solely for construction, contractor fees, engineering and utilities working capital.

81.     In violation of the Phase IV Offering Documents, Quiros and Stenger transferred about $33 million of Phase IV investor funds to a Quiros-controlled Raymond James account, which Quiros pledged as collateral for a margin loan.  Quiros also used $15.8 million in Phase IV investor funds to pay off Margin Loan III.

### (c)     Phase V Lodge and Townhouses

82.     In Phase V, Quiros and Stenger raised $45 million from 90 EB-5 investors for the construction of 30 vacation rental townhouses, 90 vacation rental cottages, a café, and a parking garage.  Under the terms of the Phase V Offering Documents, these funds were to be used solely for construction, construction supervision expenses, management fees, ancillary facilities, purchase of land and working capital.

83.     In violation of the Phase V Offering Documents, Quiros and Stenger transferred about $2.5 million of Phase V investor funds to a Quiros-controlled Raymond James account, which Quiros pledged as collateral for a margin loan.  Quiros also used $25.2 million of Phase V investor funds to pay down Margin Loans III and IV.

### (d)     Phase VI Hotel Suites Stateside

84.     In Phase VI, Quiros and Stenger raised $67 million from 134 EB-5 investors for the construction of (i) an 84-unit hotel; (ii) 84 vacation rental cottages, (iii) a guest recreation center; and (iv) a medical center.  Under the terms of the Phase VI Offering Documents, these funds were to be used solely for construction, construction supervision, construction supervision costs, parking and purchase of land contractor fees and purchase of land.

85.     In violation of the Phase VI Offering Documents, Quiros and Stenger transferred about $42 million of Phase VI investor funds to a Quiros-controlled Raymond James account, which he pledged as collateral for a margin loan.  Quiros also used about $8 million of Phase VI investor funds to pay down Margin Loans III and IV.

86.     Although the Stateside project has been closed to new investors since December 2012, the construction of the rental cottages remains incomplete and no work has begun on the recreation and medical centers.  Based on Quiros's and Stenger's own cost estimates, they need at least $26 million in additional funds to complete the Phase VI project.

### (e)     *Biomedical Project*:

87.     The Biomedical Project opened to EB-5 investors in November 2012.  Quiros and Stenger raised $83 million of the project's allotted $110 million.  Investments in the Biomedical Project were intended to be used for the construction of a research facility dedicated to the development of artificial organs, cell therapy and medical devices.  Under the terms of the Offering Documents, these funds were to be used solely for the purchase of land, construction, equipment, construction supervision expenses, architecture, infrastructure, distribution and marketing, intellectual property rights and working capital.

88.   Other than some initial site preparation and groundbreaking, no work has been done on the facility.  Moreover, nothing has been done to begin the lengthy process of securing the FDA approvals required before a facility of this type can be allowed to open.

89.   In violation of the Offering Documents, Quiros misappropriated Biomedical Project investor funds by, among other things, using approximately $10 million to back a line of credit with Citibank N.A. unrelated to the Biomedical Project and taking $2.2 million to purchase a luxury condominium at Trump Tower in New York City for his personal use.

90.   In addition, Stenger authorized the transfer of $18.2 million of Biomedical Project funds to Quiros on March 5, 2014.  Knowing that this transfer was illegal and in violation of the terms of the Offering Documents, Stenger and Quiros routed the investor funds through two different accounts.

91.   Specifically, Stenger authorized the transfer of $18.2 million in investor funds from a Biomedical Project escrow account at People's Bank in Vermont to a similarly named account at Raymond James, which was solely controlled by Quiros.  Quiros then transferred the funds from the Raymond James account to his personal account at People's Bank.  Quiros next wired the $18.2 million from the People's Bank account to Quiros's Jay Construction Management Inc. ("JCM") account at Raymond James.  Quiros used the Biomedical Project investor funds to pay off the $19 million margin loan at Raymond James that had been used to finance the initial acquisition of Jay Peak.  Quiros also directed Burstein to transfer $7 million of Biomedical Project investor funds to purchase Burke Mountain Resort ("Burke Mountain"), a separate ski resort in Vermont.  Raymond James, through Burstein, knew of and assisted Quiros and Stenger in executing each of these transactions.

92.   The following diagram illustrates the flow of Biomedical Project funds and

the obvious attempt to disguise Quiros's pilfering of those investor funds:



93. Quiros created fraudulent invoices in order to transfer over $47 million in Biomedical Project investor funds to Quiros's JCM Raymond James account, where Biomedical Project investor funds were commingled with funds from other EB-5 Projects. JCM was purportedly set up to pay contractor expenses for various EB-5 Projects. In reality, JCM acted as a slush fund for Quiros, who is JCM's President and sole shareholder.

94. Quiros and Stenger violated the terms of each of the above described limited partnerships (as set forth in the Offering Documents for each limited partnership) by using investor funds for purposes other than those specified in the Offering Documents, which strictly prohibited, among other things, (i) using funds for purposes other than those specified; (ii) borrowing from or commingling investor funds; (iii) acquiring any property with investor funds that does not belong to the limited partnership, other than as specifically authorized in the agreement; or (iv) mortgaging, conveying or encumbering partnership property that was not real property.

95.    Stenger reviewed, was responsible for, and had authority over, the contents of the Offering Documents for each of the EB-5 Projects.  Quiros also reviewed the contents of the Offering Documents for the first six EB-5 Projects (Phases I – VI), was familiar with them, and understood he had to abide by them.  He also approved the sections of the Offering Documents for Phases III – VI, detailing how investor funds would be spent.  Both Stenger and Quiros approved the contents of the Biomedical Project Offering Documents.

96.    The Raymond James Defendants knowingly participated in Quiros's and Stenger's illegal activity by designing the labyrinth of linked Raymond James accounts to commingle and misappropriate investor funds and otherwise facilitate the Ponzi scheme.  The Raymond James Defendants benefited from these activities through monies received as fees and commissions charged at each step of the scheme, and interest received from the repayment of Quiros's margin loans.

97.    The Raymond James Defendants and People's Bank also facilitated and executed an intricate web of transfers among various accounts at Raymond James, People's Bank and Citibank N.A. to disguise the fact that the majority of the EB-5 Projects were either over budget or experiencing major shortfalls.  These transfers, as tracked by Vermont regulators are depicted below:

//

//

//

**Actual Flow of Funds**



98.     The diagram above tracks the movements and co-mingling of funds between a EB-5 Project escrow account at People's Bank (gray), Raymond James accounts (red), Quiros's loan accounts (blue), investor return accounts (pink) and Jay Peak accounts (green).[5]   The intricate web of transfers is not only visually staggering, it reveals the enormous volume of transactions necessary to effectuate the scheme.

99.     In fact, despite being a principal architect of Quiros's complex account structure, Burstein testified that he became concerned about the high volume of wire transfers in one of Quiros's accounts in 2011.

100.   In total, more than $350 million of investor funds from the EB-5 Projects were

---

[5] The entire diagram, in a more interactive format can be found online at
*http://www.dfr.vermont.gov/sites/default/ext/sl/dev/full-page-funds-map.html.*

co-mingled in numerous ways, such as: (i) placing the funds from one project into the account of another; (ii) sending multiple project funds to non-segregated pooled accounts that were held in the name of entities related to Quiros, such as Jay Peak and Q Resorts; (ii) and sending funds from multiple projects to Quiros's margin account loans.

### B. The Mishandling of the EB-5 Projects' Escrow Accounts

101.    As described in the Offering Documents for the EB-5 Projects, the flow of investor funds is straightforward and unremarkable.  According to the Offering Documents, funds for each EB-5 Project deposited and held in escrow by People's Bank would, at the end of a due diligence period, be released to accounts set up and controlled by the respective general partners to pay for project expenses – as specified in the particular Offering Documents.

102.    In reality, however, the investor funds were typically transferred directly from an EB-5 Project's People's Bank escrow account in Vermont to brokerage and margin loan accounts set up at Raymond James.  Quiros exercised complete control of the funds in the Raymond James accounts – although he was neither a principal, officer nor director of the General Partners for Phases I - VI.  For example:

- On June 16 and 17, 2008, in two separate transactions, MSSI transferred $11 million from the Phase I Escrow Account at People's Bank to an MSSI Phase I account at Raymond James.  MSSI then transferred the funds from the Phase I account at Raymond James to Quiros's Phase I account at Raymond James.

- On July 1, 2008, Stenger authorized the transfer of $1 million from the Phase I Escrow Account at People's Bank to the Q Resorts account at Raymond James.

- On June 20, 2008, at Stenger's request, MSSI transferred $7 million from the Phase II Escrow Account at People's Bank to the MSSI Phase II account at Raymond James.  MSSI then transferred the funds from the Phase II account at Raymond James to Quiros's Raymond James account.

- On July 1, 2008, Stenger authorized the transfer of $600,000 from the Phase II Escrow Account at People's Bank to the Q resorts account at Raymond James.

- On September 4, 2008, Stenger authorized the transfer of $1 million from the Phase II Escrow Account at People's Bank to the Phase II Investor account at Raymond James.

- On September 15, 2008, Stenger authorized the transfer of $3 million from the Phase II Escrow Account at People's Bank to the Phase II Investor account at Raymond James.

- On September 22, 2008, Stenger authorized the transfer of $1.5 million from the Phase II Escrow Account at People's Bank to the Phase II Investor account at Raymond James.

- On October 3, 2011, Stenger authorized the transfer of $49,000 from the Phase III Escrow Account at People's Bank to the Phase I Investor account at People's Bank.

- On February 23, 2012, Stenger authorized the transfer of $62,000 from the Phase I Escrow Account at People's Bank to the Hotel Phase II Investor account at People's Bank.

103.   In addition, the Phase I, Phase II, and Phase III Offering Documents provided that the general partners could only hold investor funds in *bank* accounts.[6]  As a brokerage firm, Raymond James is neither a bank nor FDIC-insured.  Thus, Stenger's subsequent transfer of investor funds from the Phase II escrow account at People's Bank in Vermont (initially controlled by MSSI) to the Phase II Investor account at Raymond James was a blatant violation of the Phase II Offering Documents.

104.   People's Bank knew or was reckless in not knowing the terms of the Offering Documents with regard to escrow funds, and improperly allowed these and other improper transfers to occur.  Moreover, there were many other red flags that should have put People's Bank on notice of potential illegal conduct in the administration of the EB-5 Projects and their

---

[6] On May 12, 2008, eight days before he opened the Phase I Raymond James Investor account, Stenger signed an amendment on behalf of the Phase I general partner removing the requirement that Phase I investor funds be deposited only in an FDIC-insured bank account.  This amendment is invalid on its face. The May 12, 2008 amendment was in violation of the Phase I limited partnership agreement. No such amendment was ever signed for the Phase II or Phase III PPMs.

use of investor funds. In addition, given the significant number of transfers in and out of People's Bank accounts, People's Bank knew or was reckless in not knowing that these were improper and/or suspicious transactions.

105. Some of the warnings dated back to 2012, when an immigration attorney involved in the EB-5 Projects publicly severed his relationship with Quiros, implying that financial disclosures in the Offering Documents were misleading.

106. Moreover, the later EB-5 Projects were plagued by construction delays, and a crucial real estate deal necessary for one of the EB-5 Projects was canceled for lack of payment. Frequently, the EB-5 investors publicly complained that Quiros and Stenger had unilaterally changed the terms of their payouts.

107. By 2014, a widely read local investigative website, *VTDigger*, began to report on dissatisfaction among EB-5 investors who claimed that they had been misled. After a number of lawsuits and journalist investigations, Vermont Governor Peter Shumlin increased oversight of the EB-5 program within Vermont's Department of Financial Regulation in 2014.

### C. The Scheme Collapses -- The SEC and the State of Vermont Bring Enforcement Actions against Quiros and Stenger[7]

108. In June 2015, it was announced that the SEC would investigate Quiros's EB-5 projects in the Northeast Kingdom. Ten months later, on April 12, 2016, the SEC filed the SEC Action.

109. Also on April 12, 2016, the SEC filed an Emergency Motion for Temporary Restraining Order, Asset Freeze, and Other Relief in the SEC Action. That same day, the

---

[7] In addition to these government enforcement actions, two class action lawsuits have been filed in the U.S. District for the Southern District of Florida. *See Sanchez v. Raymond James & Associates, Inc., et. al., No. 1:16-cv-21646* and *Daccache v. Raymond James Financial, Inc. et. al.,* No. 1:16-cv-212575. Those complaints do not, however, name People's Bank or Frank Amigo as Defendants.

Court entered a temporary restraining order and asset freeze. On April 13, 2016, the Court appointed Michael Goldberg of Ackerman LLP as Receiver over the assets of the Defendants, including the seven limited partnerships for the EB-5 Projects, and the Relief Defendants named in the SEC Action.

110. On April 14, 2016, the Commissioner of the VDFR filed the VDFR Action.[8]

## CLASS ACTION ALLEGATIONS

111. Plaintiffs bring claims (a) individually, and (b) on behalf of a class of investors in the EB-5 Projects described herein (the "Class")[9] and seek redress and damages, stemming from breaches of fiduciary duties and other violations of law by Defendants.

112. Plaintiff Bernard Shaw currently is and was an investor in the Jay Peak Hotel Suites Phase II L.P., at the time of the wrongdoing alleged herein.

113. Plaintiff Johannes Eijmberts currently is and was an investor in the Jay Peak Hotel Suites Stateside L.P., at the time of the wrongdoing alleged herein.

114. Plaintiff Lorne Morris currently is and was an investor in the Jay Peak Hotel Suites Stateside L.P., at the time of the wrongdoing alleged herein.

115. This action is properly maintainable as a class action.

116. The Class is so numerous that joinder of all members is impracticable. The Jay Peak Limited Partnerships have hundreds of investors scattered across the United States and around the world. On information and belief, the Jay Peak Limited Partnerships have more than 600 investors and their identities and contact information is available from the business records

---

[8] Neither the SEC Action nor the VDFR Action name Raymond James, Burstein, Amigo or People's Bank as defendants.
[9] Excluded from the Class are Defendants, their family members, affiliates, subsidiaries, agents, board members, directors, officers and employees. Also excluded from the Class is the Court, the Court's staff; undersigned counsel; the State of Vermont; and the United States government.

of Defendants.

117.   Questions of law and fact are common to the Class, including, *inter alia*:

(a) Whether the Jay Peak General Partners, Quiros and/or Stenger owed fiduciary duties to the investors in the Jay Peak Limited Partnerships and, if so, whether the Jay Peak General Partners, Quiros and/or Stenger breached those duties by their conduct;

(b) Whether the Raymond James Defendants knew or were reckless in not knowing of the wrongdoing by Quiros, Stenger and others;

(c) Whether the Raymond James Defendants provided substantial assistance to Quiros and Stenger or encouraged their wrongdoing;

(d) Whether the Raymond James Defendants received benefits from the wrongdoing by Quiros or Stenger;

(e) Whether the Raymond James Defendants and People's Bank had knowledge or were reckless in not knowing that their conduct would assist Quiros and Stenger, as the General Partners, in breaching their fiduciary duties to investors in the EB-5 Projects;

(f) Whether People's Bank acted negligently in facilitating transfers to and from the Raymond James accounts controlled by Quiros.

(g) Whether the Raymond James Defendants conspired to advance Quiros's and Stenger's breaches of fiduciary duty, and if so, whether Defendants committed overt acts in furtherance of their conspiracy;

(h) Whether the Raymond James Defendants, Quiros and Stenger used the mails and wires in furtherance of the EB-5 Projects scheme;

(i) Whether the Raymond James Defendants, Quiros and Stenger violated the Racketeer Influenced and Corrupt Organizations Act;

(j) Whether Plaintiffs and the Class were injured by reason of Defendants' conduct.

118.   Plaintiffs are committed to prosecuting the action and have retained competent counsel experienced in litigation of this nature.  Plaintiffs' claims are typical of the claims of other members of the Class, and Plaintiffs have the same interests as other members of the Class. Plaintiffs are adequate Class representatives.

## **TOLLING OF THE STATUTE OF LIMITATIONS**

119.   To the extent that a statute of limitations may otherwise be applicable to this case, Defendants' actions prevent its application. As alleged above, Quiros and Stenger concealed and misrepresented the facts concerning their scheme to defraud the EB-5 Projects' investors.

120.   Because Plaintiffs and members of the Class, through the exercise of reasonable diligence, could not have discovered the existence of this fraud, all statutes of limitations were tolled under the discovery rule.

121.   Because Defendant fraudulently concealed these facts, all applicable statues of limitations have been tolled.

**COUNT I**
**CONVERSION**
**(Against Quiros and Stenger)**

122.   Plaintiffs reallege and incorporate paragraphs 1 – 121 as if fully set forth herein.

123.   As alleged above, Quiros and Stenger caused the transfer of millions of dollars from each of the Jay Peak Limited Partnership accounts to: (1) accounts held for the benefit of other Jay Peak Limited Partnerships; (2) accounts held for the benefit of Quiros; and (3) the possession of Quiros and Stenger; and/or (4) third parties in exchange for benefits received by Quiros, Stenger, or entities under their control.

124.   By virtue of these acts, Quiros and Stenger converted the property of the Jay Peak Limited Partnerships to their own use or the use of entities under their control.  In this way they exercised dominion over this property and appropriated it for their own use and beneficial enjoyment.

125.   As a result of this conversion, Plaintiffs and the Class suffered damages.

**COUNT II**
**BREACH OF CONTRACT (LIMITED PARTNERSHIP AGREEMENTS)**
**(Against Quiros and Stenger)**

126.   Plaintiffs reallege and incorporate paragraphs 1 – 121 as if fully set forth herein.

127.   As alleged above, Quiros and Stenger and/or their agents signed the Limited Partnership Agreements and directed and/or controlled the Jay Peak General Partners.

128.   The Limited Partnership Agreements must be read consistent with the implied covenant of good faith and fair dealing.

129.   Quiros and Stenger caused the Jay Peak General Partners to violate various terms of the Limited Partnership Agreements, including but not limited to the holding and use of limited partnership funds.

130.   As a result of these breaches of the Limited Partnership Agreements, Plaintiffs and the Class suffered damages.

## COUNT III
## UNJUST ENRICHMENT
### (Against Quiros, Stenger, and the Raymond James Defendants)

131.   Plaintiffs reallege and incorporate paragraphs 1 – 121 as if fully set forth herein.

132.   As alleged above, Quiros and Stenger accepted an investment of at least $500,000 from each investor in the Jay Peak Limited Partnerships for investor's participation in the Jay Peak Limited Partnerships.  Quiros and Stenger caused the Jay Peak Limited Partnerships, in turn, to transfer money from the People's Bank Accounts and/or the Raymond James Accounts into accounts under Quiros's and/or Stenger's own control.  These transfers were in exchange for services and/or expenses that were not authorized in accordance with the Offering Documents.  Accordingly, it would be inequitable for Quiros and/or Stenger not to compensate Plaintiffs and the Class for the value of those transfers.

133.   The Raymond James Defendants received commissions, margin fees, and other consideration from the investor accounts and Quiros's personal accounts in violation of the

Offering Documents.  Nevertheless, the Raymond James Defendants knew or were reckless in not knowing that the services for which they received consideration from the investors' accounts and/or Quiros's personal accounts were not conferred on the Jay Peak Limited Partnerships or for the investors and were in violation of the Offering Documents.  Thus, it would be inequitable for the Raymond James Defendants not to compensate Plaintiffs and the Class for the value of consideration received.

134.   For these reasons, Quiros, Stenger, and the Raymond James Defendants have been unjustly enriched.

## COUNT IV
## BREACH OF FIDUCIARY DUTY
### (Against Quiros and Stenger)

135.   Plaintiffs reallege and incorporate paragraphs 1 – 121 as if fully set forth herein.

136.   Quiros and Stenger owed fiduciary duties of care and loyalty to each Jay Peak Limited Partnership and each investor in the Jay Peak Limited Partnerships, by virtue of their roles as principals and/or their control over the respective general partners of the Jay Peak Limited Partnerships.

137.   The duty of care owed by Quiros and Stenger to the Jay Peak Limited Partnerships and to the investors in the Jay Peak Limited Partnerships was to refrain from engaging in grossly negligent or reckless conduct, intentional misconduct and knowing violations of the law.

138.   The duty of loyalty owed by Quiros and Stenger to the Jay Peak Limited Partnerships and to the investors in the Jay Peak Limited Partnerships included, at a minimum, the duties: (1) to account to the limited partnerships and limited partners and hold as trustee for them any property, profit, or benefit derived by the partner in the conduct of the partnership business or derived from a use by the partner of partnership property, including the appropriation

of a partnership opportunity; (2) to refrain from dealing with the partnership in the conduct or winding up of the partnership business as or on behalf of a party having an interest adverse to the partnership; and (3) to refrain from competing with the partnership in the conduct of the partnership business.

139.   By commingling funds of the Jay Peak Limited Partnerships, causing funds of the Jay Peak Limited Partnerships and the limited partners to be improperly transferred, using funds of the Jay Peak Limited Partnerships as collateral for margin loans, using funds of the Jay Peak Limited Partnerships and the limited partners to repay margin loans, diverting funds of the Jay Peak Limited Partnerships and the limited partners to purchase Jay Peak and Burke Mountain, diverting funds of the Jay Peak Limited Partnerships and the limited partners for personal use, failing to use the funds of the Jay Peak Limited Partnerships as permitted in the Offering Documents, Quiros and Stenger breached their fiduciary duties of care and loyalty to Plaintiffs and the Class.

140.   The acts of Quiros and Stenger were not in good faith and were not within the scope of their authority.

141.   As a result of these breaches of fiduciary duty, Plaintiffs and the Class suffered damages.

**COUNT V**
**Violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO")**
**18 U.S.C. § 1962(c)**
**(against Quiros, Stenger, and the Raymond James Defendants)**

142.   Plaintiffs reallege and incorporate paragraphs 1 – 121 as if fully set forth herein.

143.   Plaintiffs bring this Count against the following Defendants: Quiros, Stenger, and the Raymond James Defendants (for purposes of this Count, the "RICO Defendants").

144.   Under 18 U.S.C. §1962(c), it is unlawful for "any person through a pattern of

racketeering activity . . . to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce."

145.   At all relevant times, the RICO Defendants have been "persons" under 18 U.S.C. § 1961(3), as they are capable of holding, and do hold, "a legal or beneficial interest in property."

146.   The RICO Defendants, along with other entities and individuals, were employed by or associated with, and conducted and participated in the affairs of, one or several RICO enterprises (defined below and referred to collectively as the "Jay Peak RICO Enterprise"), through a pattern of racketeering activity, for the unlawful purpose of: (1) acquiring Jay Peak and Burke Mountain; (2) taking funds for their own personal use and profit; and (4) deceiving the EB-5 investors into believing that their funds were being used for the purposes described in the Offering Documents in order to increase the amount of funds invested into the Jay Peak Limited Partnerships.   As a direct result of their racketeering activity and common course of conduct, the RICO Defendants were able to extract hundreds of millions of dollars from Plaintiffs and the Class.

**The Jay Peak RICO Enterprise**

147.   The Jay Peak RICO Enterprise consists of the Jay Peak Limited Partnerships and the General Partners that managed and controlled the Jay Peak Limited Partnerships.

148.   At all relevant times, the Jay Peak RICO Enterprise constituted a single "enterprise" within the meaning of 18 U.S.C. §1961(4), as legal entities, as well as individuals and legal entities associated-in-fact.

149.   Alternatively, each of the Jay Peak Limited Partnerships and their associated Jay Peak General Partners constitute a single legal entity "enterprise" within the meaning of 18

U.S.C. §1961(4), through which the RICO Defendants conducted their pattern of racketeering activity. Each of the Jay Peak General Partners is controlled (directly or indirectly) by Defendants Stenger and/or Quiros. Specifically, the Jay Peak Limited Partnerships and associated general partners are as follows:

a. Phase I is the entity through which the RICO Defendants raised $17.5 million from 35 separate investors. Phase II is the entity through which the RICO Defendants raised $75 million from 65 separate investors. Jay Peak Management, Inc. is a Vermont corporation, which is the general partner of Phase I and Phase II. Jay Peak Management, Inc. is a wholly owned subsidiary of Jay Peak, and its president is Stenger.

b. Phase III is the entity through which the RICO Defendants raised $32.5 million from 65 separate investors. Jay Peak GP Services, Inc. is a Vermont corporation and is the general partner of Phase III. Stenger is Jay Peak GP Services, Inc.'s director and only principal.

c. Phase IV is the entity through which the RICO Defendants raised $45 million from 90 separate investors. Jay Peak GP Services Golf, Inc. is a Vermont corporation and the general partner of Phase IV. Stenger is Jay Peak GP Services Golf, Inc.'s director and only principal.

d. Phase V is the entity through which the RICO Defendants raised $45 million from 90 separate investors. Jay Peak GP Services Lodge, Inc. is a Vermont corporation and the general partner of Phase V. Stenger is Jay Peak GP Services Lodge, Inc.'s director and only principal.

e. Phase VI is the entity through which the RICO Defendants raised $67 million

from 134 separate investors.  Jay Peak GP Services Stateside, Inc. is a Vermont corporation and the general partner of Phase VI.  Stenger is Jay Peak GP Services Stateside, Inc.'s director and only principal.

    f.    Biomedical Project is the entity through which the RICO Defendants raised $83 million from 166 separate investors.  AnC BIO Vermont GP Services, LLC is a Vermont limited liability company and the general partner of Biomedical Project.  Quiros and Stenger are AnC BIO Vermont GP Services, LLC's managing members.

150.    Separate and apart from the RICO Defendants' pattern of racketeering activity, the Jay Peak Limited Partnerships exist to: (1) develop the Jay Peak EB-5 Projects using EB-5 investor funds; (2) bring revenue to Jay Peak; and (3) spur economic development and job creation in the Northeast Kingdom.  The Jay Peak Limited Partnerships are not publicly traded, but they have reporting obligations, protections and responsibilities unique to the State of Vermont.  The General Partner entities exist to manage the funds for the Jay Peak Limited Partnerships.

151.    At all relevant times, the Jay Peak RICO Enterprise: (a) had an existence separate and distinct from each RICO Defendant; (b) was engaged in and whose activities affected interstate commerce; (c) was separate and distinct from the pattern of racketeering in which the RICO Defendants engaged; and (d) was an ongoing and continuing organization consisting of legal entities.

### The RICO Defendants' Pattern of Racketeering Activity through the Jay Peak RICO Enterprise

#### *Quiros and Stenger*

152.   Quiros and Stenger used each of the Jay Peak Limited Partnerships to raise money and then divert millions of dollars for their own use.  In order to raise capital for each of the Jay Peak Limited Partnerships, the Jay Peak General Partners, Stenger and Quiros made a series of false and misleading statements to prospective investors and in the Offering Documents, as discussed in Paragraphs 5, 7, 9 – 10, 12, 32 – 46, and 53 – 107.

153.   Upon raising funds for the Jay Peak Limited Partnerships, Quiros and Stenger knowingly wired money out of the Jay Peak Limited Partnerships' investor accounts at People's Bank and Raymond James for unauthorized purposes and for Quiros's personal gain.  Quiros and Stenger also routinely authorized the transfer of investors' funds out of the Jay Peak Limited Partnerships' People's Bank escrow accounts in violation of the Offering Documents.

154.   Further, Quiros improperly used additional investor funds to pay down and pay off margin loans (including paying nearly $2.5 million in margin interest) he and the Raymond James Defendants set up in the name of the Jay Peak Limited Partnerships at Raymond James.

### The Raymond James Defendants

155.   The Raymond James Defendants conceived of and participated in the conduct of the Jay Peak RICO Enterprise's affairs by developing a mechanism by which Quiros and Stenger could misappropriate funds without detection – specifically, by opening investment and margin accounts on behalf of each of the Jay Peak Limited Partnerships to facilitate the transfer of funds between and among the Jay Peak Limited Partnerships as well as to Quiros, Stenger, and entities under their control.

156.   Further, among other things, the Raymond James Defendants:

- Assisted in the diversion and misuse of investors' funds, knowing that these funds belonged to investors and not to Quiros or Stenger;

- Provided margin loans to Quiros, which were collateralized with assets

39

belonging to the investors;

- Facilitated an intricate web of transfers among various accounts at Raymond James to disguise the fact that the majority of the seven Jay Peak EB-5 Projects were either over budget or experiencing shortfalls; and

- Devised a plan to collateralize investors' funds for personal loans to Quiros.

157.   The Raymond James Defendants generated substantial commissions and fees by facilitating these activities.

### Specific Predicate Acts of Racketeering

158.   The foregoing demonstrates that the RICO Defendants, through the Jay Peak RICO Enterprise, knowingly participated, directly or indirectly, in a pattern of racketeering activity within the meaning of 18 U.S.C. §§1961(1), 1961(5) and 1962(c), to advance their illegal scheme to defraud the Jay Peak Limited Partnerships investors, and which employed the use of the mail and wire facilities, in violation of 18 U.S.C. §1341 (mail fraud), 18 U.S.C. §1343 (wire fraud), and 18 U.S.C. § 1957 (money laundering).

### *Mail Fraud 18 U.S.C. §1341*

159.   The RICO Defendants violated 18 U.S.C. §1341 by sending or receiving, or by causing to be sent and/or received, materials via U.S. mail or commercial interstate carriers for the purpose of executing the unlawful scheme by means of false pretenses, misrepresentations, promises, and omissions.

160.   The RICO Defendants' use of the mails and wires include, but are not limited to, the transmission, delivery, or shipment of the following fraudulent documents by the RICO Defendants or third parties that were foreseeably caused to be sent as a result of the RICO Defendants' illegal scheme:

- Private Placement Memoranda;

- Limited Partnership Agreements;

- Limited Partner updates and correspondence;

- Emails;

- Financial Statements;

- K-1 tax returns;

- Sales and marketing materials; and

- Other documents that misrepresented and concealed the true nature of the Jay Peak Limited Partnerships.

161.   Based on information and belief, the RICO Defendants (or their agents), for the purpose of executing the illegal scheme, sent and/or received (or caused to be sent and/or received) by mail or by private or interstate carrier, documents by mail or a private carrier affecting interstate commerce, including the items described above and alleged below:

### Wire Fraud, 18 U.S.C. § 1343

162.   The RICO Defendants knowingly and with intent to obtain money and property from others by means of materially false and fraudulent pretenses, representations, and promises, knowing that such pretenses, representations, and promises were false and fraudulent when made, and for the purpose of executing the scheme, transmitted and caused to be transmitted certain wire communications in interstate and foreign commerce, as set forth below:

| AMOUNT | DATE | WIRE COMMUNICATION |
|---|---|---|
| $11 million | June 16 and 17, 2008 | Interstate wire transfers sent from People's Bank to Raymond James. |
| $1 million | June 20, 2008 | Interstate wire transfer sent from People's Bank to Raymond James. |
| $13.5 million | June 23, 2008 | Interstate wire transfer sent from Raymond James to People's Bank. |

| $5 million | June – October 2008 | Interstate wire transfers sent from Raymond James to People's Bank |
| $600,000 | July 1, 2008 | Interstate wire transfer sent from People's Bank to Raymond James. |
| $1 million | September 4, 2008 | Interstate wire transfer sent from People's Bank to Raymond James. |
| $3 million | September 15, 2008 | Interstate wire transfer sent from People's Bank to Raymond James. |
| $1.5 million | September 22, 2008 | Interstate wire transfer sent from People's Bank to Raymond James. |
| $18.2 million | March 5, 2014 | Interstate wire transfer sent from People's Bank to Raymond James. |
| $10.7 million | April 2015 | Wire transfer of $10.7 million of Phase VII funds from Raymond James to Citibank to repay Quiros' personal line of credit. |
| | June 2008 – 2016 | Additional interstate wire transfers of funds to be established through discovery. |

### Money Laundering, 18 U.S.C. § 1956(a)(1)

163.  The RICO Defendants knowingly and with the intent of promoting the

misappropriation of investor funds and to conceal and disguise the nature, source and ownership

of the misappropriated investor funds, engaged in the following financial transactions:

| AMOUNT | DATE | LAUNDERING TRANSACTION |
| --- | --- | --- |
| $7.6 million | June 23, 2008 | Transfer of $7.6 million from Phase I partnership account at Raymond James to account at Raymond James in the name of Q Resorts (controlled by Quiros) |
| $11 million | June 25, 2008 | Purchase of $11 million in U.S. Treasury Bills in Phase I partnership account at Raymond James, using margin loan, to hide the $7.6 million transfer on June 23, 2008. |
| $7.6 million | June 25, 2008 | Borrowing $7.6 million from Raymond James on margin to finance purchase of U.S. Treasury Bills. |
| $6 million | June 23, 2008 | Transfer of $6 million from Phase II partnership account at Raymond James to account at Raymond James in the name of Q Resorts (controlled by Quiros) |
| $7 million | June 25, 2008 | Purchase of $7 million in U.S. Treasury Bills in Phase II partnership account at Raymond James, using margin loan, to hide the $6 million transfer on June 23, 2008. |

| $6 million | June 25, 2008 | Borrowing $6 million from Raymond James on margin to finance purchase of U.S. Treasury Bills. |
|---|---|---|
| $1.5 million | 2008 | Purchase of $1.5 million in U.S. Treasury Bills in Phase I partnership account at Raymond James, using margin loan, to hide the $1 million transfer. |
| $105 million | 2008-2011 | $105 million in investor funds from Phases I-V used to repay margin loans from Raymond James. |
| $49,000 | October 3, 2011 | Transfer from People's Bank Phase III account to People's Bank Phase I account. |
| $62,000 | February 23, 2011 | Transfer from People's Bank Phase I account to People's Bank Phase II account. |
| $22.4 million | February 24, 2012 | Transfer of $22.4 million of investor funds (Phase VI and Phase V) from Quiros entity account at Raymond James to repay margin loan at Raymond James. |
| $6.5 million | February 2012 – March 2014 | Use of $6.5 million in investor funds (Phase V and Phase VI) to repay margin loan at Raymond James. |
| $13.6 million | June 23, 2008 | Transfer of funds from partnership account at Raymond James to Quiros entity account at Raymond James |
| | June – October, 2008 | Purchase of U.S. Treasury Bills using margin loan to hide transfer of investor funds out of partnership account at Raymond James |
| | June 2008 – 2016 | Additional money laundering transfers of funds to be established through discovery. |

164.   The RICO Defendants have not undertaken the practices described herein in isolation, but as part of a common scheme and conspiracy.

**RICO Injury**

165.   By reason of, and as a result of the conduct of the RICO Defendants, and in particular, their pattern of racketeering activity, Plaintiffs and Class members have been injured in their business and/or property in multiple forms, including but not limited to encumbrance and loss of the funds they invested in the Jay Peak Limited Partnerships.

166.   The RICO Defendants' violations of 18 U.S.C. § 1962(c) have directly and proximately caused these injuries and damages to Plaintiffs and Class members, and Plaintiffs and Class members are entitled to bring this action for treble damages, as well as

injunctive/equitable relief, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c).

## COUNT VI
### Acquisition of Control of Enterprise in Violation of 18 U.S.C. § 1962(b)
### (against Quiros)

167.   Plaintiffs reallege and incorporate paragraphs 1 – 121 and 142 – 166 as if fully set forth herein.

168.   Under 18 U.S.C. § 1962(b), it is "unlawful for any person through a pattern of racketeering activity . . . to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce." As discussed in Paragraphs 7, 9 – 10, 12, 53 – 77, and 89, Quiros used the pattern of racketeering activity set forth in Count V to purchase Jay Peak and a luxury condominium at Trump Tower in New York City.

169.   By reason of, and as a result of the conduct and Quiros's participation in the aforementioned racketeering activity, Plaintiffs and Class members have been injured in their business and/or property in multiple forms, including but not limited to encumbrance and loss of the funds they invested in the Jay Peak Limited Partnerships.

170.   Quiros's violation of 18 U.S.C. § 1962(b) has directly and proximately caused these injuries and damages to Plaintiffs and Class members, and Plaintiffs and Class members are entitled to bring this action for treble damages, as well as injunctive/equitable relief, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c).

## COUNT VII
### Conspiracy to Violate 18 U.S.C. §§ 1962(b) and (c), 18 U.S.C. §§ 1962(d)
### (against Quiros, Stenger, and the Raymond James Defendants)

171.   Plaintiffs reallege and incorporate paragraphs 1 – 121 and 142 - 170 as if fully set forth herein

172.   Under 18 U.S.C. §1962(d), it is "unlawful for any person to conspire to violate" 18 U.S.C. §§ 1962(b) and (c).

173.   As described above in Paragraphs 7, 9 – 10, 12, and 53 – 107, Quiros and Stenger conspired to violate 18 U.S.C. §§ 1962(b) and (c) by knowingly managing and operating the Jay Peak RICO Enterprise for the purpose of effecting the pattern of racketeering activity described above.   Moreover, as described above in Paragraphs 7 and 53 – 103, the Raymond James Defendants conspired to violate 18 U.S.C. §§ 1962(b) and (c) by facilitating Quiros's and Stenger's conduct, management, and pattern of racketeering activity through the Jay Peak RICO Enterprise.

174.   By reason of, and as a result of Quiros, Stenger's, and the Raymond James Defenants' RICO Conspiracy, Plaintiffs and Class members have been injured in their business and/or property in multiple forms, including but not limited to encumbrance and loss of the funds they invested in the Jay Peak Limited Partnerships.

175.   The RICO Defendants' violations of 18 U.S.C. § 1962(d) have directly and proximately caused these injuries and damages to Plaintiffs and Class members, and Plaintiffs and Class members are entitled to bring this action for treble damages, as well as injunctive/equitable relief, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c).

### COUNT VIII
### AIDING AND ABETTING CONVERSION
### (Against the Raymond James Defendants and People's Bank)

176.   Plaintiffs reallege and incorporate paragraphs 1 – 125 as if fully set forth herein.

177.   As alleged above, Quiros and Stenger converted the property of Plaintiffs and the Class for their own use or the use of third parties.

178.   The Raymond James Defendants and People's Bank knowingly or recklessly

facilitated the transfer of millions of dollars from Plaintiffs and the Class to: (1) accounts held for the benefit of other Jay Peak Limited Partnerships; (2) the possession of Quiros and/or Stenger or entities under their control; and/or (3) third parties in exchange for benefits received by Quiros, Stenger, and/or entities under their control.

179. The Raymond James Defendants benefited from the acts described in the foregoing paragraph in the form of margin fees, commissions, and other consideration.

180. The Raymond James Defendants actively concealed their participation in the improper transfer, commingling and/or conversion of investor funds by Quiros and Stenger by conceiving of a scheme to and facilitating the use of margin accounts and the purchase of securities in the Raymond James Accounts to hide the fact that millions of dollars had been diverted out of these accounts or otherwise encumbered.

181. People's Bank knowingly or recklessly facilitated the transfer of millions of dollars from each of the Plaintiffs and the Class to: (1) accounts held for the benefit of other Jay Peak Limited Partnerships; (2) the possession of Quiros, Stenger, and/or entities under their control; and/or (3) third parties in exchange for benefits received by Quiros, Stenger, or entities under their control by transferring of escrowed funds from the People's Bank Accounts, that were under the control of the Jay Peak General Partners, to accounts at Raymond James that were not under the control of the Jay Peak General Partners and by transferring escrowed funds between the People's Bank Accounts. Each of these acts served to deprive the investors of the benefit of their funds.

182. By virtue of these acts, the Raymond James Defendants and People's Bank aided and abetted the conversion of investor funds by Quiros and Stenger.

## COUNT IX
## AIDING AND ABETTING BREACH OF FIDUCIARY DUTY

**(Against the Raymond James Defendants and People's Bank)**

183.   Plaintiffs reallege and incorporate paragraphs 1 – 121 and 135 – 141 as if fully set forth herein.

184.   As alleged above, Quiros and Stenger breached their fiduciary duties of care and loyalty to Plaintiffs and the Class.

185.   The Raymond James Defendants, knowingly or recklessly facilitated the commingling of funds of the Jay Peak Limited Partnerships, causing funds of the Jay Peak Limited Partnerships to be improperly transferred, using funds of the Jay Peak Limited Partnerships as collateral for margin loans, using funds of the Jay Peak Limited Partnerships to repay margin loans, diverting funds of the Jay Peak Limited Partnerships to purchase Jay Peak and Burke Mountain, receiving funds of the Jay Peak Limited Partnerships in exchange for Jay Peak, diverting funds of the Jay Peak Limited Partnerships for personal use, failing to use the funds of the Jay Peak Limited Partnerships as permitted in the Offering Documents.

186.   The Raymond James Defendants benefited from the acts described in the foregoing paragraph in the form of margin fees, commissions, and other benefits.

187.   The Raymond James Defendants actively concealed their participation in the breaches of fiduciary duty by Quiros and Stenger by facilitating the purchase of securities in the Raymond James Accounts, hiding the fact that millions of dollars had been diverted out of these accounts.

188.   People's Bank knowingly or recklessly facilitated the breaches of fiduciary duty by Quiros and Stenger by transferring escrowed funds from the People's Bank Accounts, that were under the control of the Jay Peak General Partners, to accounts at Raymond James that were not under the control of the Jay Peak General Partners and by commingling escrowed funds

between the People's Bank Accounts.

189.   By virtue of these acts, the Raymond James Defendants and People's Bank aided and abetted the breaches of fiduciary duty by Quiros and Stenger.

### Escrow Defendant Counts

### COUNT X
### NEGLIGENCE
### (against People's Bank)

190.   Plaintiffs reallege and incorporate paragraphs 1 – 121 as if fully set forth herein.

191.   In connection with their investments in the Jay Peak Limited Partnerships, Plaintiffs and each member of the Class entered into an Escrow Agreement with People's Bank. As part of investing in the Jay Peak Limited Partnerships, each investor sent their funds into an escrow account at People's Bank in the name of the limited partnership.

192.   Due to the escrow relationship between Plaintiffs and the members of the Class and People's Bank, People's Bank had a duty to exercise reasonable skill and ordinary diligence in disbursing the investor funds entrusted to it.

193.   By releasing escrow funds to improper accounts at non-bank financial institutions and into accounts that were not under the control of the Jay Peak General Partners, People's Bank did not meet its duties to Plaintiffs and the Class.

194.   These actions caused substantial damage to Plaintiffs and the Class.

### COUNT XI
### BREACH OF CONTRACT
### (Against People's Bank)

195.   Plaintiffs reallege and incorporate paragraphs 1 – 121 as if fully set forth herein.

196.   In connection with their investments in the Jay Peak Limited Partnerships, Plaintiffs and each member of the Class entered into an Escrow Agreement with People's Bank.

As part of investing in the Jay Peak Limited Partnerships, each investor sent their funds into an escrow account at People's Bank in the name of the limited partnership.

197.   Under the Escrow Agreements, upon the satisfaction of certain conditions People's Bank was under an obligation to return investor funds or to release the funds "to the Limited Partnership."  In addition, most of the Escrow Agreements expressly provided that "the use of Investor monies… will be fully explained in the LP Agreement and Offering Memorandum."

198.   The Escrow Agreements must be read consistent with the implied covenant of good faith and fair dealing.

199.   People's Bank, however, released escrowed investor funds to impermissible accounts, in violation of the requirements of the Limited Partnership Agreements, Offering Memoranda, and Escrow Agreements.

200.   These transfers constituted breaches of the Escrow Agreements.

201.   These actions caused substantial damage to Plaintiffs and the Class.

## COUNT XII
## BREACH OF FIDUCIARY DUTY
### (Against People's Bank)

202.   Plaintiffs reallege and incorporate paragraphs 1 – 121 as if fully set forth herein.

203.   In connection with their investments in the Jay Peak Limited Partnerships, Plaintiffs and each member of the Class entered into an Escrow Agreement with People's Bank. As part of investing in the Jay Peak Limited Partnerships, each investor sent their funds into an escrow account at People's Bank in the name of the limited partnership.

204.   People's Bank owes a fiduciary duty to Plaintiffs and the Class as a result of the escrow agreement, which includes at a minimum, an obligation to exercise reasonable skill and

ordinary diligence in following the escrow instructions, as well as to disclose information about suspicious activity occurring in connection with the escrowed funds.

205. People's Bank, however, failed to exercise reasonable skill and ordinary diligence in following the escrow instructions and failed to notify Plaintiffs and the Class of suspicious activity occurring in connection with the escrowed funds.

206. People's Bank's actions constituted breaches of People's Bank's fiduciary duties to Plaintiffs and the Class.

207. People's Bank's actions caused substantial damage to Plaintiffs and the Class.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on their own behalf and on behalf of the Class, pray for judgment as follows:

(a)    an order certifying the proposed Class, designating Plaintiffs as the named representative of the Class, and designating their counsel, Berman DeValerio as Class Counsel;

(b)    an award to Plaintiffs and Class Members of compensatory, exemplary, punitive and statutory penalties and damages, including interest, in an amount to be proven at trial;

(c)    an award of attorneys' fees and costs, as allowed by law;

(d)    an award of pre-judgment and post-judgment interest, as provided by law;

(e)    leave to amend this Complaint to conform to the evidence produced at trial; and

(f)    such other relief as may be appropriate under the circumstances.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury on all issues so triable.

Dated:  May 17, 2016

**WITTEN, WOOLMINGTON, CAMPBELL
& BERNAL, P.C.**

Patrick J. Bernal (VT Bar License No. 5550)
4900 Route 7A, P.O. Box 2748
Manchester Center, VT  05255-2748
Telephone:  (802) 362-2560
Facsimile:  (802) 362-7109
pjb@wittenetal.com

*Local Counsel for Plaintiffs and the Class*

**BERMAN DEVALERIO**
Kathleen M. Donovan-Maher
Steven J. Buttacavoli
Mark A. Delaney
Daryl Andrews
Nathaniel L. Orenstein
Steven L. Groopman
Corey W. Silva
One Liberty Square
Boston, MA 02109
Telephone:  (617) 542-8300
Facsimile:  (617) 542-1194
kdonovanmaher@bermandevalerio.com
sbuttacavoli@bermandevalerio.com
mdelaney@berrmandevalerio.com
dandrews@bermandevalerio.com
norenstein@bermandevalerio.com
sgroopman@bermandevalerio.com
csilva@bermandevalerio.com

*Lead Counsel for Plaintiffs and the Class*